THE STATE OF OHIO, APPELLEE, v. FIRESTONE, APPELLANT.

(No. 435—Decided October 29, 1941.)

*Mr. W. Thurman Todd,* prosecuting attorney, *Mr. Frank Celebrezze* and *Mr. Neil W. McGill,* for appellee.

*Mr. Jay S. McDevitt* and *Messrs Graham & Graham,* for appellant.

MONTGOMERY, J. The indictment returned against the appellant charges that he on "the 9th day of April, 1940, at the county of Knox aforesaid, unlawfully did attempt to induce one Harry Barrington to make his escape from the Ohio penitentiary, he, the said Harry Barrington, being then and there a prisoner confined in said penitentiary and convicted of the offense of extortion, the same being an offense against the laws of the state of Ohio, punishable with imprisonment."

A motion having been sustained to require that it be done, the state filed a bill of particulars which in

effect set forth that on the day in question the defendant, Robert L. Firestone, went to the Ohio state sanitarium, and giving his name as Frank Sancetta, asked to see Harry Barrington, whom he did see; that Barrington was at that time a convict in the Ohio state penitentiary, but in the honor camp at the Ohio state sanitarium; and that at the time set forth the appellant did attempt to induce Barrington to escape from the custody of the penitentiary by offering him $6,000 to flee from the honor camp and go to Mexico.

Trial having been had, the accused was convicted of the offense charged, and the trial court then sentenced him "to be imprisoned in the Ohio state penitentiary, at Columbus, Ohio, for a term not exceeding that for which convict Harry Barrington, No. 74028, was committed to said penitentiary, and pay the costs of prosecution taxed at $...., for which execution shall issue."

An appeal was perfected to this court from that judgment of conviction. There are fourteen assignments of error. As we have occasionally observed, the greater the number of assignments of error the less merit there is likely to be found in them. We have, however, considered all the assignments of error. Some of them are in fact duplications of other assignments, and some are too trivial to deserve consideration. Attention should be directed to three of them.

■ The indictment and conviction were had under the first part of Section 12833, General Code, which reads as follows:

"Whoever aids, induces or attempts to induce a convict to escape or attempt to escape from the penitentiary, shall be imprisoned in the penitentiary for a term not exceeding that for which such convict was committed * * *."

It is urged by counsel for appellant that if any crime were committed by him it was not under the quoted portion of this section, and that the trial court was in error in refusing to sustain a motion for a new

trial and in refusing to discharge the accused. It is the contention that Barrington was not, at the time of the acts charged, an inmate of the Ohio penitentiary, and, therefore, the quoted portion of Section 12833, General Code, has no application to the appellant.

The record shows that Barrington pleaded guilty to the charge of extortion in the Common Pleas Court of Cuyahoga county and was sentenced to the Ohio penitentiary. He served approximately one year and five months at the penitentiary; was then transferred as an honor prisoner to the London prison farm and later was sent to the sanitarium at Mt. Vernon, Ohio, designated in the record as being a "London prison honor camp."

It seems to be conceded that, while at Mt. Vernon, Barrington was a prisoner at the London prison farm, but it is argued that he was no longer a prisoner at the Ohio penitentiary, and that the two institutions are separate and distinct.

We see no merit in this contention. Barrington's sentence was to the Ohio penitentiary and not to the London prison farm. There would be no authority for sentencing him in the first instance to the London prison farm. The laws of Ohio provide the circumstances and conditions under which prisoners at the Ohio penitentiary may be transferred to this prison farm, and also provide the circumstances and conditions under which prisoners may be transferred back from the prison farm to the penitentiary.

Section 1835-1, General Code, provides the use to which this prison farm shall be placed; for what class of prisoners it shall be used; for what purpose it shall be conducted; for the transfer thereto of prisoners from the Ohio penitentiary; and for the authority to be vested in the superintendent of the prison farm.

So far as we can discover, no other section of the General Code distinguishes between the penitentiary and the prison farm. There are no special rules or

regulations governing the latter. The Legislature in making provision for it evidently contemplated that it should be regarded as a department of the Ohio penitentiary for the use and advantage of a certain class of prisoners. Since there is no authority for sending prisoners to the prison farm in the first instance and since they get there only by transfer from the penitentiary, to which latter institution they may be returned, it seems to us that there can be no question that these prisoners are, in contemplation of the law, prisoners of the Ohio penitentiary until pardoned or paroled as provided by law, or until the expiration of the sentences imposed upon them. We see no merit in appellant's contention in this respect.

■ It seems to us that the real question in the case is whether this appellant was guilty of the crime charged, or, to state it differently, whether there was sufficient evidence to sustain the jury's verdict of guilty, and the judgment rendered by the trial court in conformity with the verdict. We have read every page of the record presented, and have given careful consideration to the elaborate briefs prepared by counsel, because an interesting question is raised.

One Albert Ruddy was president of the carpenters' union district council in Cleveland. Barrington had charge of the west section of Cleveland for labor unions in this council. Firestone was head of what is designated as the Glaze-Rite Company, which, as he testified, put glazing in glass windows, put window panes in sashes and puttied them. He was the head of this organization and was also business representative of the janitors' union. According to his testimony he never did any glazing and he never worked as a janitor.

According to the testimony of Barrington, he and Ruddy had for a long period of time been engaged in "a shake-down" game in the city of Cleveland. By agreement he had "taken the rap" under an alleged

promise of Ruddy to see that he was let out in a few months. Still being confined after approximately three years, he was getting very restless. From Mt. Vernon he sent Ruddy a telegram, which appears in the record, and which might well be understood by the recipient as containing a threat. Two days after the receipt of this telegram Ruddy and Firestone drove to Mt. Vernon in Ruddy's car. Ruddy remained at the Curtis Hotel while Firestone took the car and drove out to the sanitarium for an interview with Barrington. This happened in April, 1940.

Barrington testified that he did not know Firestone and Firestone testified that he did not know Barrington. Barrington testified that Firestone said to him: "You are to tell Ruddy that you are not going to talk," and "you know what people get when they talk." Then Barrington testified that in this conversation Firestone said (referring to the place where Barrington was working, and the main road): "It is a hundred to a hundred and fifty feet from the chicken coop" and, "How would you like six grand and laid in Mexico?" Which was interpreted as meaning six thousand dollars, with transportation to Mexico. Firestone denies this part of the conversation, and denies that any such question was ever asked Barrington. Therefore, it became a question for the jury to determine which one was telling the truth. We cannot find that the jury was not justified in believing Barrington.

One thing which is most significant is that Firestone posed as Frank Sancetta, impliedly being a member of a notorious gang operating in Cuyahoga county. The obvious purpose of such impersonation was to impress upon Barrington the danger which would hang over him if he did not comply with the demands made. Firestone equivocates in this respect, but he admits that he did use this alias. He admits freely that he allowed himself to be referred to as Frank. He obtained a note from Barrington, which is in evidence, introduc-

ing him to Barrington's wife, in which he is referred to as Frank. Barrington's wife testified on behalf of the state to the effect that Firestone came to her following his interview with her husband. She also testified concerning the conversation which she had with Firestone, and the threats readily implied from his statements.

Nothing definite having come of this first interview with Barrington, sometime thereafter Firestone made another trip to Mt. Vernon, at which time, before he could see Barrington, he was compelled to see the superintendent, Dr. Anderson. When Firestone gave his version of his introduction to Dr. Anderson by Bishop, the guard, he testified, that when Dr. Anderson came in, Bishop said: " 'This is the party who wants to see Harry Barrington,' and I walked up to the Doctor and I said: 'My name is Frank Sancetta.' "

In view of this testimony there can be no question but that Firestone did use this alias, and there can be no reasonable doubt as to his purpose in so using it. And Dr. Anderson testified that, on this second trip of Firestone, he insisted that the interview be in his presence for the protection of Barrington, who he had been advised was afraid.

It is suggested that Firestone's object in making these trips was that he might do a friendly act to Ruddy and prevent Barrington from "squawking." He did not succeed, because two months thereafter Ruddy was indicted and later convicted in Cuyahoga county, largely upon the testimony of Barrington. Firestone's whole course of conduct, including the use of the alias, and the implied threats, both to Barrington and to Barrington's wife, is consistent with the the state's theory and Barrington's testimony.

In our judgment there was ample evidence to sustain the verdict of the jury and the judgment of the lower court.

■ There remains one other assignment of error de-

serving some consideration. It is that one Isadore Gross was permitted to testify in rebuttal, contradicting the answers given by Firestone on cross-examination, that in 1937 Firestone had made a trip to New York to interview Gross, who was the key witness in racketeering prosecutions then pending in Cleveland. Gross testified that on this occasion Firestone offered him $1,500 in cash and another $1,500 after the case should be over, if he would not testify against these Cleveland racketeers, who were subsequently convicted.

In the 1937 case Firestone was charged with having offered a bribe to prevent a prosecuting witness from testifying. In the 1940 instance he is charged with having offered a bribe to a prisoner to escape from a penal institution and not to testify. Is the evidence of the former action competent? We think so, under the provisions of Section 13444-19, General Code, and the numerous authorities cited in the annotations thereto, with which authorities counsel are familiar, and which they have discussed. That section reads as follows:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

We find no prejudicial error in this record, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

LEMERT, P. J., and SHERICK, J., concur.